| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------X | **ROBINSON** |
| DIANE MUCCI,<br><br>                      Plaintiff,<br><br>   - against -<br><br>NEW YORK MEDICAL COLLEGE.,<br><br>                      Defendant.<br>-------------------------------------------------------X | Docket No.:<br><br>ECF CASE<br><br>COMPLAINT<br><br>PLAINTIFF DEMANDS<br>A JURY TRIAL<br><br>**07 CIV. 2660** |

      Plaintiff, **DIANE MUCCI**, by her attorneys, **GOODSTEIN & WEST**, complaining of defendant, **NEW YORK MEDICAL COLLEGE**, alleges as follows:

    1.    This is an action brought pursuant to the Family and Medical Leave Act of 1993. Jurisdiction of this Court is established pursuant to 29 U.S.C. §2617(a)(2) which permits an action to recover damages or equitable relief in any Federal Court of competent jurisdiction by any one or more employees for a violation of said Act.

## PARTIES

    2.    Plaintiff, DIANE MUCCI resides at Cortlandt Manor, New York, County of Westchester.

    3.    Defendant, NEW YORK MEDICAL COLLEGE, with offices at Valhalla, New York 10595, is an employer subject to the Family and Medical Leave Act of 1993, 29 U.S.C. §2611. On information and belief, defendant, NEW YORK MEDICAL COLLEGE, is engaged in commerce,

or in industry or activity affecting commerce, and employs 50 or more workers for each working day during each of 20 or more calendar work weeks in the current or preceding calendar year. On information and belief, defendant, NEW YORK MEDICAL COLLEGE, employed plaintiff, DIANE MUCCI at a work site where it employed more than 50 employees.

4. Plaintiff, DIANE MUCCI, on information and belief, is an eligible employee as defined under the Family and medical leave Act of 1993, in that she was employed by defendants for at least 12 months prior to her request for leave, and she worked at least 1,250 hours with said defendants during the previous 12 month period. 29 U.S.C. §2611.

5. Plaintiff, DIANE MUCCI, began her employment with defendant in or about February 1996. This employment continued without break until the date of her termination on or about October 13, 2006. During that time, plaintiff's work performance was always satisfactory.

6. On or about May 31, 2006, plaintiff's doctor informed defendant that she was disabled and needed to stop work as of June 1, 2006 because of severe back spasms, marked anxiety and depression. It was estimated that she would be out of work on leave for a period of six weeks. Plaintiff was out seven weeks during which time she was seen at least twice by a medical professional. Defendant knew plaintiff remained out seven weeks and was seen by a medical professional twice. This condition qualified as a "serious health condition" pursuant to the Family and Medical Leave Act. Pursuant to a medical provider, defendant knew of plaintiff's course of treatment. Thus, her illness qualified as a serious health condition. Defendant should have but did not place plaintiff on FMLA Leave; plaintiff is entitled to all the protections of the Act, despite defendant's failure. Burnett v. LFW Inc d/b/a/ Habitat Co.____ F3rd ____ (7th Cir 2006) (A copy of

2

plaintiff's Doctor's letter is annexed as Exhibit 1; a copy of the Burnett decision is annexed as Exhibit 2).

7. Plaintiff returned to work and was restored to her equivalent position as required by the FMLA.

8. By letter dated October 13, 2006 plaintiff was informed she was terminated as part of a layoff. However, plaintiff was told that she was terminated because she took a leave of absence of seven weeks commencing June 1, 2006. (A copy of this letter is annexed as Exhibit "3").

9. Because of the nature of plaintiff's medical condition, she provided such notice as was practicable to the employer. Such actual notice was given and medical documentation was also given to defendants.

10. The actions of defendants complained of in the Cause of Action are willful violations of 29 U.S.C. §2612, §2614, §2615, §2617 and 29 C.F.R. §825 112, §825 114, §825 208, §825 220.

11. By terminating plaintiff because of her 7 week leave period, defendant violated the Family and Medical Leave Act's protection against discriminatory termination.

12. Plaintiff demands a jury trial on her cause of action.

## AS AND FOR THE CAUSE OF ACTION

13. In all circumstances, it was defendant's responsibility to designate leave as FMLA qualify and defendant was prohibited from discriminating against plaintiff for using FMLA leave. However, she was terminated on October 13, 2006 because she took 7 weeks of leave.

14. Plaintiff was entitled to Family and Medical Leave Act leave, and said leave could not be utilized to terminate her employment.

15. Accordingly, defendants has violated the Family and Medical leave Act of 1993, by terminating her of 29 U.S.C. §§2615 and 2617.

**WHEREFORE,** plaintiff demands judgment against defendant as follows:

**On the Cause of Action:**

(1) An amount equal to back wages, benefits, pension for plaintiff from October 13, 2006;

(2) Interest on the above described amount calculated at the prevailing rate;

(3) An additional amount as liquidated damages equal to the sum of the amount described above including interest;

(4) Employment reinstatement;

(5) Reasonable attorneys' fees pursuant to 29 U.S.C. §2617; and

(6) Reasonable expert witness fees and other costs of the action pursuant to 29 U.S.C. §2617.

Dated: New Rochelle, New York
March 28, 2007

Yours, etc.,

GOODSTEIN & WEST

By: _____
Robert David Goodstein (RDG-5443)
Attorneys for Plaintiff
DIANE MUCCI
56 Harrison Street, Suite 401
New Rochelle, New York 10801
(914) 632-8382

# EXHIBIT 1

# MAPLE MEDICAL,™ LLP

*Pulmonary, Critical Care, Rheumatology and Internal Medicine*

| | | |
|---|---|---|
| Richard B. Frimer, M.D. | | Louis D. Vizioli, M.D. |
| Andrew M. Goldstein, M.D. | | Geoffrey E. Hulse, M.D. |

Lisa H. Youkeles, M.D.
*Internal Medicine*

| | | |
|---|---|---|
| Shari Glickstein, M.D. | | William Zarowitz, M.D. |
| Richard B. Lask, M.D. | | Todd R. Shinnick, M.D. |
| Martin H. Biers, M.D. | | Joanne Tamburri, M.D. |

*Rheumatology, Internal Medicine*
Elena Weinstein, M.D.

May 31, 2006

To whom it may concern,

My patient, Diane Mucci, is disabled and needs to stop working as of tomorrow, June 1. She is suffering from severe back spasms and marked anxiety and depression brought on by stress at work. This has been worsening over the past year to the point where she is unable to continue working.

It is unclear at this time when she will be able to return. An estimated time for return would be about six weeks from now.

Sincerely,

William Zarowitz, M.D.

*Claim 140936*
*Wallingford Ct*
*1 888 440 6118*

170 Maple Avenue, Suite G1
White Plains, NY 10601
Tel: (914) 328-0932
Fax: (914) 328-9851

143 Maple Avenue
White Plains, NY 10601
Tel: (914) 683-8610
Fax: (914) 683-8635

30 Davis Avenue
White Plains, NY 10605
Tel: (914) 328-2151
Fax: (914) 328-2359

# EXHIBIT 2

472 F.3d 471 **Page 1**
472 F.3d 471, 153 Lab.Cas. P 35,231, 12 Wage & Hour Cas.2d (BNA) 193, 18 A.D. Cases 1536, 33 NDLR P 243
(Cite as: 472 F.3d 471)

H

Briefs and Other Related Documents

United States Court of Appeals,
Seventh Circuit.
David BURNETT, Plaintiff-Appellant,
v.
LFW INC., doing business as The Habitat Company, Defendant-Appellee.
No. 06-1013.

Argued Sept. 18, 2006.
Decided Dec. 26, 2006.

Background: Employee who underwent prostate biopsy and was diagnosed with prostate cancer shortly after being fired brought action against his former employer alleging violations of Family and Medical Leave Act (FMLA) and Americans with Disabilities Act (ADA). Employer moved for summary judgment. The United States District Court for the Northern District of Illinois, Charles P. Kocoras, Chief Judge, 2005 WL 3312573, granted motion. Employee appealed.

Holdings: The Court of Appeals, Williams, Circuit Judge, held that:
(1) employee had an FMLA-qualifying "serious health condition";
(2) employee's remarks that he was "sick" and "wanted to go home," when considered in their proper context, were sufficient to put employer on notice of his need for FMLA leave, satisfying the element of FMLA interference claim that was primarily in dispute;
(3) employee had to proceed under direct method of proof on FMLA retaliation claim as he had not identified a similarly situated person who was treated more favorably;
(4) fact issue existed as to whether employer would have terminated employee for insubordination even absent his exercise of his FMLA rights, precluding summary judgment on FMLA retaliation claim; and
(5) employee failed to show he had "disability" within meaning of ADA at time of his termination.
Affirmed in part, reversed in part, and remanded.

West Headnotes

[1] Federal Courts ⚖︎776
170Bk776

[1] Federal Courts ⚖︎802
170Bk802
Court of Appeals reviews district court's grant of summary judgment de novo, viewing all facts and reasonable inferences drawn therefrom in light most favorable to nonmoving party. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[2] Labor and Employment ⚖︎363
231Hk363

[2] Labor and Employment ⚖︎366
231Hk366
To prevail on FMLA interference claim, employee need only show that his employer deprived him of an FMLA entitlement and no finding of ill intent is required; accordingly, employee must establish that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled. Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

[3] Labor and Employment ⚖︎351(3)
231Hk351(3)
Employee who underwent prostate biopsy and was diagnosed with prostate cancer shortly after being fired had an FMLA-qualifying "serious health condition" that involved continuing treatment by a health care provider; he was incapacitated, e.g., unable to work, due to a condition, cancer, that (1) required periodic treatments, e.g., diagnostic examinations, (2) continued for an extended period, over four months, and (3) might have caused episodic rather than continuous incapacity. Family and Medical Leave Act of 1993, § 101(11), 29 U.S.C.A. § 2611(11); 29 C.F.R. § 825.114(a)(2)(iii).

[4] Labor and Employment ⚖︎355
231Hk355
Notice requirements of the FMLA are not onerous, and employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions. Family and Medical Leave Act of 1993, § 102(e), 29 U.S.C.A. § 2612(e); 29 C.F.R. §§ 825.302, 825.303.

[5] Labor and Employment ⚖︎355
231Hk355
Employee's FMLA notice obligation is satisfied so long as he provides information sufficient to show

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that he likely has an FMLA-qualifying condition. Family and Medical Leave Act of 1993, § 102(e)(2)(B), 29 U.S.C.A. § 2612(e)(2)(B); 29 C.F.R. § 825.303(b).

[6] Labor and Employment ⇨390(2)
231Hk390(2)
Because adequacy of FMLA notice is fact-rich question, it is perhaps best resolved by trier of fact, particularly where employer and employee dispute quantity and nature of communications regarding employee's illness. Family and Medical Leave Act of 1993, § 102(e), 29 U.S.C.A. § 2612(e); 29 C.F.R. §§ 825.302, 825.303.

[7] Labor and Employment ⇨355
231Hk355
Employee's bare assertion that he is "sick" is usually insufficient to satisfy FMLA notice requirement; that reference does not suggest to employer that medical condition might be serious or that the FMLA otherwise could be applicable. Family and Medical Leave Act of 1993, § 102(a)(1)(D), 29 U.S.C.A. § 2612(a)(1)(D); 29 C.F.R. §§ 825.302, 825.303.

[8] Labor and Employment ⇨355
231Hk355
Once employee informs his employer of probable need for medical leave, FMLA imposes duty on employer to conduct further investigation and inquiry to determine whether proposed leave in fact qualifies as FMLA leave. 29 C.F.R. §§ 825.302(c), 825.303(b), 825.305(d).

[9] Labor and Employment ⇨355
231Hk355
Terminated employee's remarks that he was "sick" and "wanted to go home," when considered in their proper context, were sufficient to put employer on notice of his need for FMLA leave, satisfying the element of FMLA interference claim that was primarily in dispute; over period of four months, employee communicated that he was suffering from "weak bladder" which was severe enough to preclude potential transfer of assignment, he was on trajectory of increased medical visits and testing, including blood test showing elevated PSA, he had recently had prostate biopsy which test employer knew was used to diagnose cancer, and requested help in his work duties as result he repeatedly stated that he "felt sick" and intimated that his condition might be similar to his brother-in-law's latent prostate cancer, and his concerns were significant enough for him to suggest that he might commit suicide if he ended up bedridden as result of prostate cancer. Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

[10] Labor and Employment ⇨389(4)
231Hk389(4)
In making out charge of retaliation under the FMLA, employee may proceed under direct or indirect methods of proof; under direct method, employee must present evidence that his employer took materially adverse action against him on account of his protected activity. Family and Medical Leave Act of 1993, § 105(a)(2), 29 U.S.C.A. § 2615(a)(2).

[11] Federal Civil Procedure ⇨2497.1
170Ak2497.1
Under direct method of proving FMLA retaliation claim, if employee's evidence is contradicted the case must be tried unless employer presents unrebutted evidence that he would have taken the adverse employment action against employee even if he had no retaliatory motive; in that event, employer is entitled to summary judgment because it has shown that employer was not harmed by retaliation. Family and Medical Leave Act of 1993, § 105(a)(2), 29 U.S.C.A. § 2615(a)(2).

[12] Labor and Employment ⇨365
231Hk365
To proceed under indirect method of proving FMLA retaliation claim, employee must show that after taking FMLA leave he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner. Family and Medical Leave Act of 1993, § 105(a)(2), 29 U.S.C.A. § 2615(a)(2).

[13] Labor and Employment ⇨766
231Hk766
Insubordination may be a valid, nondiscriminatory basis for termination.

[14] Federal Civil Procedure ⇨2497.1
170Ak2497.1
Genuine issue of material fact, as to whether employer would have terminated employee for insubordination even absent his exercise of his FMLA rights, precluded summary judgment on employee's FMLA interference claim. Family and Medical Leave Act of 1993, § 105(a)(2), 29 U.S.C.A. § 2615(a)(2).

[15] Civil Rights ⇨1218(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

472 F.3d 471
(Cite as: 472 F.3d 471)

Page 3

78k1218(1)

[15] Labor and Employment ⇐351(2)
231Hk351(2)
Concepts of "disability" under the ADA and "serious health condition" under the FMLA are distinct concepts that require different analyses. Family and Medical Leave Act of 1993, § 101(11), 29 U.S.C.A. § 2611(11); Americans with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. § 12102(2).

[16] Civil Rights ⇐1218(3)
78k1218(3)
Fact that employee suffered from undiagnosed prostate cancer at time of his termination did not alone prove that he was "disabled" under the ADA. Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12102(2)(A).

[17] Civil Rights ⇐1218(3)
78k1218(3)
Employee with undiagnosed prostate cancer did not have actual "disability," absent showing that he was substantially limited in major life activity of working; employee failed to show, or even attempt to show, that his frequent urination and his temporary restriction on heavy lifting and strenuous activity substantially limited his ability to perform a class or broad range of jobs. Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(j)(3)(i).

*474 Peter Andjelkovich, Bradley J. Wartman, Andjelkovich & Associates, Chicago, IL, for Plaintiff-Appellant.

Jeffrey S. Fowler (argued), Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for Defendant-Appellee.

Before BAUER, ROVNER, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

David Burnett brought this action alleging violations of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA) against his former employer, The Habitat Company. The district court granted The Habitat Company's motion for summary judgment, concluding that Burnett had failed to provide his employer with notice of his medical condition, as required under both the FMLA and ADA. Because we find that Burnett provided his employer information sufficient to notify his employer of his need for FMLA leave, we reverse the grant of summary judgment on his FMLA claim. However, we conclude that Burnett has failed to show that he was disabled within the meaning of the ADA at the time of his termination, and therefore affirm the grant of summary judgment on Burnett's ADA claim.

I. BACKGROUND

The following facts are recounted in the light most favorable to Burnett, the nonmovant. Burnett began working as a janitor for The Habitat Company ("Habitat"), a property management company, in 1989. Beginning in 1990, Burnett came under the supervision of Sergio Polo. In 1994, Burnett became a "detailer," responsible for verifying that apartment equipment and furnishings were in working order before the arrival of a new tenant. As a detailer, Burnett was sometimes required to lift heavy objects, such as closet doors and appliances. According to Polo, no complaints regarding Burnett's performance were brought to his attention before October 2003.

In October 2003, Burnett first informed Habitat that he was experiencing some medical difficulties. That month, Polo offered to transfer Burnett to a different location in the facility, presumably because of recurring conflicts between Burnett and an assistant engineer. Burnett, however, declined the transfer, telling Polo that given his "weak bladder," he did not wish to *475 transfer to the position, which would result in reduced restroom access. Further, he informed Polo that he was going to see a doctor to determine the cause of the bladder problem. At the end of November, Polo gave Burnett a verbal warning regarding his performance.

After his week-long absence in December 2003, Burnett again spoke with Polo about his health. On December 11, Burnett presented Polo with a copy of a doctor's order for blood testing to justify some of his absences. Burnett further explained that during his time off he had visited the doctor, undergone a physical examination, and learned that he had two serious problems--high PSA (Prostate-Specific Antigen) and cholesterol levels. Burnett did not explain the significance of a heightened PSA level nor did anyone ask him to do so. However, he did inform Polo of his upcoming doctor's appointments and need to see a urologist.

On December 16, Burnett met with Polo, other Habitat managers, and a union representative to further discuss his absences. Burnett told the individuals present at the meeting that he had been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

472 F.3d 471
(Cite as: 472 F.3d 471, *475)

Page 4

"sick" during his week-long absence. He elaborated that although he "didn't look sick," he felt he was "getting sick or was sick." And, he named the probable source of his illness by comparing his circumstance with that of his brother-in-law who had been afflicted with prostate cancer. That same day, Polo sent an email to other supervisors informing them that Burnett should be afforded sick leave on January 6 and 8, 2004, to attend doctor's appointments.

On January 7, 2004, Burnett notified Habitat that he would be undergoing a prostate biopsy on January 27. Burnett gave one of his supervisors, Mitch Hehr, a document describing the prostate ultrasound and biopsy procedures. The document provided that "[i]ndications for the examination are an abnormal rectal exam or an elevation of prostate cancer screening blood test (PSA)." Under standard Habitat policy, Hehr should have provided Polo with a copy of the document, although Polo denies receiving it. That same day, Polo issued Burnett a reprimand for "substandard work."

One week later, on January 14, Polo gave Burnett written reprimands regarding two events occurring on that day. First, Polo accused Burnett of wasting company time by disrupting another employee's work. Second, Polo stated that Burnett was disruptive during their conversation about Burnett's upcoming appointment with Human Resources. Specifically, Burnett believed that he was scheduled to meet with the Human Resources manager that afternoon to discuss his desire to transfer to a midnight shift, but Polo assured him that the meeting was scheduled for the following day. When Burnett called Human Resources, he learned that Polo was correct, but accepted the Human Resources Department's offer to see him that day.

Polo met Burnett at the time clock as Burnett prepared to leave work to attend the meeting with Human Resources. At that time, Polo stated that he would not grant Burnett the desired transfer, because Burnett was a "loose cannon." He also gave Burnett a written reprimand concerning the first episode of the day. When Burnett asked whether that would be his final reprimand, Polo said "no." Instead, Polo referred to a document in his hand as Burnett's final reprimand. Burnett claims to have understood Polo's conduct to indicate that he was being terminated.

Thereafter, Burnett filed a union grievance, and a union meeting was set for January 26. On the advice of his union representative, Burnett did not return to *476 work until the day of the union meeting. As a result, Polo issued a reprimand stating that Burnett had missed work on January 15, 16, and 19, and suspended Burnett for three days without pay.

At the union meeting, Burnett told Polo and others that he was scheduled to have a biopsy the following day. He described the biopsy as "a nasty, nasty procedure" involving bleeding and infections. He also stated that if he were ultimately diagnosed with a progressive form of prostate cancer like that of his brother-in-law, he might commit suicide, because he lived alone, had no means of caring for himself, and did not wish to be bedridden.

On January 27, Burnett underwent the prostate biopsy, as scheduled. The next day, Burnett gave Habitat a document entitled "Treatment Plan," confirming that he had had the biopsy and instructing him to avoid heavy lifting or strenuous activity following the biopsy. It is undisputed that Polo received a copy of the document. Additionally, Burnett spoke to one of his supervisors about his work restrictions and asked for help with his duties. According to Burnett, the supervisor ignored his request, and Burnett agreed to perform his duties to the best of his ability. That same day, Burnett submitted a previously-approved vacation request for the second week of February (the week he anticipated receiving the biopsy results). The next day, January 29, he submitted an additional vacation request, this time for the first week in February, purportedly because he did not get a light duty assignment or the help that he had requested on the previous day and was worried about being injured.

Burnett's second request for leave set off a flurry of activity among the Habitat supervisors. One supervisor informed Burnett that Polo wished to see him in his office. In response, Burnett asked the supervisor to notify Polo that he felt sick and wanted to go home. Two other supervisors then confronted Burnett at the time clock and demanded that he visit Polo before leaving work. Burnett refused, saying again that he felt sick. At that time, the supervisors contacted Polo via radio, requesting that Polo immediately meet them (and, by implication, Burnett) at the time clock. When Polo arrived, Burnett told him that he felt sick and wanted to go home. According to Burnett, Polo stated that if Burnett was referring to the "1-27-04 document [the Treatment Plan, which advised Burnett to refrain from heavy lifting], it's not important." Burnett replied that the

Treatment Plan was important to him and that, "I'm not going to sit here and argue ... my health is more important than arguing with [you]." Burnett then punched out at the time clock, and Polo accused him of being insubordinate.

After Burnett left work on January 29, Polo and the other managers met to discuss him. Polo testified that at that point he "probably" knew that Burnett had undergone a prostate biopsy, and that he generally knew that biopsies were a method of testing for cancer. Nonetheless, on February 2, Polo sent a letter to Burnett terminating his employment effective January 30, 2004.

On January 31, Burnett went to the emergency room due to complications from the biopsy. He delivered the discharge paperwork to a colleague on or about February 3, who passed the documents on to a supervisor. Polo testified that he "briefly" looked at the documents, but did not reconsider his decision. On February 10, Burnett was diagnosed with prostate cancer.

Burnett filed suit against Habitat, claiming violations of the FMLA and the ADA. The district court granted summary judgment in favor of Habitat, primarily because *477 it concluded that Burnett could not show that he had provided adequate notice to Habitat that he suffered from a serious health condition, and thus no FMLA or ADA claim could be made. Burnett timely appealed.

## II. ANALYSIS

[1] We review a district court's grant of summary judgment de novo, viewing all facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See, e.g., Anders v. Waste Mgmt. of Wis., Inc.,* 463 F.3d 670, 675 (7th Cir.2006). Summary judgment is only appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. The FMLA Claims

We begin with Burnett's claims under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-54. The FMLA entitles any eligible employee suffering from a serious health condition that renders him unable to perform the functions of his position to twelve workweeks of leave during each twelve-month period. 29 U.S.C. § 2612(a)(D). The FMLA makes it unlawful for an employer to interfere with an employee's attempt to exercise any FMLA rights. *Id.* § 2615(a)(1). It also forbids an employer from retaliating against an employee who exercises FMLA rights. *See id.* § 2615(a)(2) (prohibiting discrimination against an individual who opposes practices made unlawful by the FMLA); *id.* § 2615(b) (prohibiting discrimination against persons who participate in or institute FMLA proceedings or inquiries). The FMLA therefore contemplates the interference and retaliation theories of recovery advanced here. *See Hoge v. Honda Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir.2004).

1. FMLA Interference Claim

[2] To prevail on an FMLA interference claim, an employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required. *Hoge,* 384 F.3d at 244. Accordingly, the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled. *Id.* Habitat concedes that Burnett has satisfied the first and second requirements. *See* 29 U.S.C. § 2611(2)(A) (detailing the FMLA's years- and hours-in-service eligibility requirements); *id.* § 2611(4) (defining which employers are subject to the FMLA's provisions). [FN1]

> FN1. In enacting the FMLA, Congress authorized the Secretary of Labor to promulgate regulations necessary to carry out the FMLA. *See* 29 U.S.C. § 2654. Because "[n]either party challenges the propriety of the regulations, ... we accept for purposes of this decision that they are legitimate and controlling under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Stoops v. One Call Commc'ns.,* 141 F.3d 309, 311 (7th Cir.1998).

We easily conclude that Burnett has satisfied the third and fifth elements of an interference claim. With regard to the third prong, Burnett argues, and we agree, that his incapacity due to undiagnosed prostate cancer and the diagnostic procedures pertaining thereto, entitled him to FMLA leave. An employee is entitled to FMLA leave if (1) he is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

afflicted with a "serious health condition" and (2) that condition *478 renders him unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(D).

[3] An employee has a "serious health condition" within the meaning of the FMLA, where he has "an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). We are satisfied that Burnett had an FMLA-qualifying "serious health condition" that involved "continuing treatment by a health care provider." He was incapacitated (e.g., unable to work) due to a condition (cancer) that: (1) required periodic treatments (e.g., diagnostic examinations), (2) continued for an extended period (over four months), and (3) might have caused episodic rather than continuous incapacity. *See* 29 C.F.R. § 825.114(a)(2)(iii); [FN2] *see also Price v. City of Fort Wayne,* 117 F.3d 1022, 1024 (7th Cir.1997) (listing a biopsy as one of a series of procedures qualifying the plaintiff as having a "serious health condition" involving "continuing treatment by a health care provider").

> FN2. 29 C.F.R. § 825.114 provides in pertinent part that:
> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness ... that involves:
> ...
> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
> ...
> (iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
> ...
> (A) Requires periodic visits for treatment by a health care provider ...;
> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).
> ...
> (b) Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition.

As a result of his serious health condition, Burnett was unable to perform at least one of his job functions. *See* 29 C.F.R. § 825.115 (an employee is deemed unable to perform the functions of his position when he is "unable to perform any one of the essential functions of [his] position"). In this case, Burnett was instructed not to lift heavy objects or engage in strenuous activity after his biopsy, two tasks required of detailers, who routinely move heavy closet doors and appliances. Thus, we conclude that Burnett provided sufficient evidence to survive summary judgment with respect to the third prong of an interference claim, and Habitat has offered no argument to the contrary.

The fifth prong of the test need not detain us long as it is beyond dispute that Habitat failed to provide Burnett with requested leave. Indeed, Burnett was terminated before receiving any of the time off that he sought for the month of February. Having concluded that the first, second, third, and fifth elements of an interference case have been satisfied, we turn to the fourth element and the crux of the dispute between the parties--notice.

[4][5] The notice requirements of the FMLA are not onerous. An employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions. *See Phillips v. Quebecor World RAI, Inc.,* 450 F.3d 308, 311 (7th Cir.2006) (citing 29 C.F.R. § 825.303(b)). *479 Indeed, "the employee can be completely ignorant of the benefits conferred by the Act...." *Stoops v. One Call Commc'ns.,* 141 F.3d 309, 312 (7th Cir.1998). The employee's notice obligation is satisfied so long as he provides information sufficient to show that he *likely* has an FMLA-qualifying condition. *See Aubuchon v. Knauf Fiberglass, GmbH,* 359 F.3d 950, 953 (7th Cir.2004) ("[T]he employee's duty is merely to place the employer on notice of a *probable* basis for FMLA leave." (emphasis added)); *Collins v. NTN-Bower Corp.,* 272 F.3d 1006, 1008 (7th Cir.2001) ("[E]mployers ... are entitled to the sort of notice that will inform them ... that the FMLA *may* apply." (emphasis added)). [FN3]

> FN3. The FMLA also imposes requirements on the timing of notice. *See, e.g.,* 29 U.S.C. § 2612(e); 29 C.F.R. §§ 825.302, 825.303, 825.305. Because Habitat does not challenge the timing of, but rather the content of, Burnett's communications, we do not discuss the FMLA's timing requirements

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

472 F.3d 471
(Cite as: 472 F.3d 471, *479)

Page 7

in detail. However, we do note that because Burnett could not know precisely how he would react to his biopsy and whether his employer would accommodate him during his recovery period, we believe this case presents an instance in which the need for leave was not foreseeable. *See* 29 C.F.R. § 825.303 ("When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.").

[6][7] Although adequacy of notice is a fact-specific question, we have held that in the usual case, an employee's bare assertion that he is "sick" is insufficient. *Phillips,* 450 F.3d at 312; *Collins,* 272 F.3d at 1008. [FN4] Simply put, "[a]n employee's reference to being 'sick,' ... does 'not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable.' " *Phillips,* 450 F.3d at 312 (quoting *Collins,* 272 F.3d at 1009). In certain instances, however, an employer is obligated to provide medical leave even though an employee has failed even to say he is sick. Indeed, an employee may be excused from expressing a need for medical leave in at least two exceptional situations--when circumstances provide the employer with sufficient notice of the need for medical leave or when the employee is incapable of providing such notice. *See Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 381-82 (7th Cir.2003). Some observable changes in an employee's condition (such as a broken arm) present an obvious need for medical leave, thereby obviating the need for an express request for medical leave. *See id.* at 382. For instance, in *Byrne,* we stated that an employee's uncharacteristic conduct at work (beginning to sleep on the job after an unblemished four-year work history) perhaps provided adequate notice of a medical condition. *See id.* at 381. Alternatively, we have said that an employee may be excused from giving notice where his medical condition (e.g., clinical depression) prevents him from communicating the nature of his illness and resulting need for medical leave. *See id.* at 382.

FN4. Courts have declined to craft "categorical rules" regarding what constitutes adequate notice. *See, e.g., Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 724 (6th Cir.2003); *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir.1995). Because adequacy of notice is a fact-rich question, it is perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness.

Although Burnett seeks the benefit of the *Byrne* exceptions, we conclude that *Byrne* does not apply here. Burnett cannot *480 show that his medical condition resulted in a dramatic, observable change in his work performance or physical condition. By his own admission, Burnett "didn't look sick." Burnett also cannot show that his illness somehow impeded his ability to communicate his health needs to his employer. Accordingly, Burnett is subject to the general notice rule, requiring that he do more than simply declare that he is sick.

[8] Once an employee informs his employer of his probable need for medical leave, the FMLA imposes a duty on the employer to conduct further investigation and inquiry to determine whether the proposed leave in fact qualifies as FMLA leave. *See Aubuchon,* 359 F.3d at 953 ("[The employee] just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave. That is enough to trigger the employer's duty to request such additional information ... as may be necessary to confirm the employee's entitlement.") (citing 29 C.F.R. §§ 825.302(c), 825.303(b), 825.305(d)).

[9] With this framework in mind, we consider Burnett's request for leave. The facts of this case present a close question. At no point prior to his termination did Burnett communicate to anyone that he had prostate cancer--nor could he, as he was not diagnosed until shortly after being fired. Habitat therefore insists that in remarking that he was "sick" and "wanted to go home" on January 29, 2004, Burnett did no more than declare "I'm sick."

This argument effectively disregards the surrounding context of Burnett's remarks. However, when considered in their proper context, Burnett's remarks on January 29 were sufficient to put Habitat on notice of his need for medical leave. Over a period of four months, Burnett communicated that: (1) he was suffering from "a weak bladder," which was severe enough to preclude a potential transfer of assignment; (2) he was on a trajectory of increased medical visits

and testing, including a blood test showing an elevated PSA; (3) he had recently had a prostate biopsy (a test that Polo knew was used to diagnose cancer) and requested help in his work duties as a result; (4) he repeatedly stated that he "felt sick" and intimated that his condition may be similar to his brother-in-law's latent prostate cancer; and (5) his concerns were significant enough for him to suggest that he might commit suicide if he ended up bedridden as a result of prostate cancer. Burnett therefore gave an account of symptoms and complaints, which formed a coherent pattern and progression, beginning with initial symptoms, continuing with doctor's visits, and then additional testing and results--all communicated (in one form or another) to Polo.

In response, Habitat argued at oral argument that asking an employer to consider medical information provided over a four-month period to appreciate the context of an employee's declaration of sickness is a troubling "novel theory," placing untold obligations on employers. Not at all. In *Collins,* we specifically noted that the employee could--indeed *should*--have invoked employer knowledge about her depression, which traced back over one year:

> [Plaintiff's] [d]epression did not come on her overnight. In this suit she contends that it had been developing for years and that she had mentioned the problem to supervisors early in 1997, a year before the absence that led to her discharge. Once Collins knew that she had a problem, she could predict that this would lead her to miss work on occasion, and she could have given the notice contemplated by § 825.302 long before March 1998. Then when depression incapacitated her on a particular day she *481 could have made clear the "serious" nature of her condition by referring to knowledge already in the employer's possession. A reference to being "sick" not only withheld important information from the employer but likely threw it off the scent. Certainly it did not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable.

272 F.3d at 1008-09. The point of *Collins* is that it is entirely appropriate under the FMLA for an employee to give accumulating information about a medical condition as it evolves. To do otherwise risks losing the claim. Accordingly, we do not believe we place an unreasonable burden on Habitat in asking it to consider Burnett's disclosed medical history in assessing the seriousness of his assertion of sickness on January 29. Burnett is not seeking to reach back over vast periods of time to grasp at an isolated mention of illness that was reasonably banished from his employer's institutional memory. He seeks only to invoke Habitat's institutional memory as to the natural course of his illness, which spanned a period of only four months (and included the same supervisor throughout the entire relevant period). And, importantly, Habitat cannot claim a loss of memory here. Polo approved Burnett's requests for days off for doctor's appointments little more than a month before his termination. Just days before his termination, Burnett discussed his upcoming biopsy with Polo and others at the union grievance meeting. Finally, during his January 29 run-in with Burnett at the time clock, Polo himself made reference to the overall context of Burnett's health, stating that Burnett's post-biopsy treatment plan "didn't matter."

When considered in their proper context, then, Burnett's declarations on January 29 were more than a vague and untethered claim of sickness. Rather, Burnett's proclamation of illness was supported by details suggesting a serious health condition. Accordingly, we reverse the grant of summary judgment on Burnett's FMLA interference claim.

2. FMLA Retaliation Claim

[10][11][12] In making out a charge of retaliation under the FMLA, a plaintiff may proceed under the direct or indirect methods of proof. *See Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir.2004). Under the direct method, a plaintiff must present evidence that his employer took materially adverse action against him on account of his protected activity. *See Phelan v. Cook County,* 463 F.3d 773, 787 (7th Cir.2006) (setting forth showings required to prove retaliation under Title VII) (citing *Burlington Northern & Santa Fe Ry. v. White,* --- U.S. ----, ----, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006)). [FN5] If the plaintiff's evidence is thereafter contradicted:

> FN5. Although *Phelan* concerned retaliation under Title VII, "we assess a claim of FMLA retaliation in the same manner that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Buie,* 366 F.3d at 504 n. 3.

the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the

plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

See *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir.2002). [FN6] To proceed under the indirect *482 method, Burnett "must show that after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner." *Hull v. Stoughton Trailers, LLC,* 445 F.3d 949, 951 (7th Cir.2006). Because Burnett has not identified a similarly situated person treated more favorably than he, he must proceed under the direct method of proof.

> FN6. That *Stone* speaks of an "adverse employment action" rather than a "materially adverse action," is without consequence in this case. See *White,* 126 S.Ct. at 2409 (holding that Title VII's "anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace"). The retaliatory action alleged here, Burnett's termination, would satisfy either standard.

Habitat claims that Burnett cannot demonstrate a causal relationship between his request for FMLA leave and his termination because Habitat disclaims knowledge of any protected activity or serious health condition. This argument is essentially identical to the argument that Habitat raises with regard to Burnett's purported failure to provide adequate notice to Habitat under the FMLA interference claim, and it runs into the same problems discussed above.

As we concluded above, over the course of four months Burnett gave his employer sufficient notice of his serious medical condition. Thereafter, he engaged in protected activity by taking time off upon realizing that he would not be able to perform one of the essential functions of the job and would not be provided an accommodation to assist in performing the tasks. He was subsequently terminated for the allegedly insubordinate act of leaving work on January 29--unquestionably a materially adverse action. Those facts, therefore, suggest a direct, causal connection between the protected activity and adverse action.

[13] Habitat's assertion that it terminated Burnett on the basis of insubordination does not justify the grant of summary judgment in this case. Although insubordination may be a valid, nondiscriminatory basis for termination, *see, e.g., Kahn v. United States Sec'y of Labor,* 64 F.3d 271, 279 (7th Cir.1995), a question of fact remains as to whether this was the true reason for Burnett's termination.

First, Habitat's classification of Burnett's conduct as insubordinate stems in large measure from its mistaken belief that Burnett was not entitled to FMLA leave on January 29, because he had failed to provide notice of his medical condition. By Habitat's reasoning, then, Burnett had no more FMLA protection when he left work on January 29, 2004, than any other Habitat employee. Because we have already concluded that Burnett did provide sufficient notice of his condition, we must disagree.

[14] Second, the present factual scenario is different from the normal situation where the alleged insubordination was entirely separate from the request for FMLA leave. Here, Burnett's alleged insubordinate act *was* his request for FMLA leave, or at least a key component of it. That is, his demand to go home because he felt ill is the very act that Habitat labels as insubordination. Thus, under the circumstances, Habitat has not presented "unrebutted evidence" that it would have terminated Burnett even absent Burnett's exercise of his FMLA rights. *Stone,* 281 F.3d at 644. Accordingly, a jury question remains, *see id.,* and Burnett's FMLA retaliation claim should have survived summary judgment. [FN7]

> FN7. This is not to say that the FMLA allows an employee to exercise his FMLA rights in a patently insubordinate way, but rather that a question of fact remains regarding Habitat's motivation.

*483 B. The ADA Discrimination Claims

[15] Although we concluded above that Habitat had notice of Burnett's medical condition, Burnett's ADA claims fail because the existence of a medical condition does not satisfy the ADA's disability standard. Indeed, " '[d]isability' under the ADA and 'serious health condition' under the FMLA are distinct concepts that require different analyses." *Rhoads v. F.D.I.C.,* 257 F.3d 373, 387 n. 12 (4th Cir.2001) (citing 29 C.F.R. § 825.702(b)); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1295 (11th Cir.2006); *Stekloff v. St. John's Mercy Health Sys.,* 218 F.3d 858, 861 (8th Cir.2000).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Therefore, in order to prevail on his ADA claims, Burnett must show that he was entitled to the ADA's protections at the time of his termination.

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Therefore, before we consider Burnett's claims under the ADA for failure to accommodate or discriminatory termination, we must first assess whether Burnett was disabled within the meaning of the ADA.

An individual is considered to have a disability under the ADA if (1) he has an impairment that substantially limits one or more of his major life activities; (2) he has a record of such an impairment; or (3) his employer regards him as having such an impairment. See 42 U.S.C. § 12102(2). Because Burnett had no record of impairment, to prevail on his ADA claims, he must show that either (1) he had an impairment that substantially limits a major life activity; or (2) Habitat regarded him as having such an impairment.

[16] Burnett cannot satisfy the first option. Burnett would have us find that he was disabled purely because he was suffering from undiagnosed prostate cancer at the time of the adverse employment action. Unfortunately for Burnett, however, typically diagnosis does not prove disability. See 29 C.F.R. pt. 1630, App., § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."); see also Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566-67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (holding that while some conditions are invariably substantially limiting, to determine whether other conditions are disabling requires an individualized assessment); Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 513 (3d Cir.2001) ("[I]t is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish 'disability.' Rather, the inquiry as to disability is to be made on a case-by-case basis."); Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 884 (6th Cir.1996) ("Although both arthritis and [multiple sclerosis] can be disabling in some instances, they [are] not so substantially limiting in [every] case."). As a result, even though Burnett suffered from undiagnosed prostate cancer, that fact alone does not prove that he was disabled under the ADA.

[17] Rather, we must consider the specific facts of Burnett's case in our assessment of whether he was disabled at the time of his termination. Even giving Burnett *484 the benefit of all inferences, we find he has failed to show that he had an impairment that substantially limited a major life activity. Although Burnett fails to expressly identify the affected major life activity, we will presume that he seeks to show that he was substantially limited in the major life activity of working. Under the ADA, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); see Kupstas v. City of Greenwood, 398 F.3d 609, 612 (7th Cir.2005). Rather, "[t]he term substantially limits means significantly restricted in the ability to perform either a *class of jobs* or a *broad range of jobs* in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (emphases added); see also Sutton v. United Air Lines, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Because Burnett has failed to show (or to even attempt to show) that his frequent urination and his temporary restriction on heavy lifting and strenuous activity substantially limited his ability to perform a class or broad range of jobs, he has not established a substantial limitation in the major life activity of working.

Burnett has likewise failed to show that Habitat regarded him as having a substantially limiting impairment. Nothing in the record suggests that Habitat considered Burnett to be impaired or substantially limited in his ability to carry out his duties. Habitat did not alter its expectations of his work performance although it was aware of Burnett's doctor's appointments, high PSA, and biopsy. Even when he requested assistance at work following his biopsy, Habitat considered him fully capable and did not provide assistance. Accordingly, we find no basis for concluding that Habitat ever regarded Burnett as disabled. Summary judgment was proper on Burnett's ADA claims.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Burnett's FMLA claims, and AFFIRM the grant of summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

472 F.3d 471  
**(Cite as: 472 F.3d 471, *484)**

judgment as to his ADA claims. We REMAND for further proceedings consistent with this opinion.

472 F.3d 471, 153 Lab.Cas. P 35,231, 12 Wage & Hour Cas.2d (BNA) 193, 18 A.D. Cases 1536, 33 NDLR P 243

Briefs and Other Related Documents (Back to top)

. 2006 WL 1177336T2 (Appellate Brief) Reply Brief of Plaintiff-Appellant David Burnett (Apr. 20, 2006)Original Image of this Document (PDF)

. 2006 WL 1036261T1 (Appellate Brief) Corrected Brief of Defendant-Appellee LFW, Inc. (Apr. 7, 2006)

. 2006 WL 728705T1 (Appellate Brief) Brief of Plaintiff-Appellant David Burnett (Mar. 7, 2006)

. 06-1013 (Docket) (Jan. 3, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



# NEW YORK MEDICAL COLLEGE

HUMAN RESOURCES
VALHALLA, NEW YORK 10595  TEL 914-594-4560  FAX 914-594-4309

October 13, 2006

Diane Mucci
58 Cedar Pond Lane
Cortlandt Manor, NY 10567

Dear Ms. Mucci:

This relates to your position and employment with New York Medical College as a Administrator in the department of Campus Operations. It is with regret that due to a department reorganization, you are being notified that your position is being eliminated and that as discussed with you, your layoff from the College is effective today, October 13, 2006. It is important for you to know that this has been a difficult decision because of the contributions you have made during your employment.

Since you have ten years of service, you are eligible for 10 weeks of severance as per College policy. The severance will be paid out through the bi-weekly payroll and during that period your medical and dental benefits will be continued. You will also receive payment for any unused accrued vacation and personal time.. Following your severance, you will receive notification from Empire regarding your eligibility to continue your health and dental benefits under COBRA and can contact Human Resources about conversion of existing life insurance policies and information on your tax-deferred annuity plans. You will also be eligible to apply for unemployment benefits through the Department of Labor.

We recognize that this is a difficult time and hope that we can be of assistance to you. Please feel free to contact Human Resources with any questions you may have (914) 594-4560. We thank you for your contributions to the College, and wish you the best of success in the future.

Sincerely,

Peter M. Brown
Associate VP Human Resources